UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CORIELL BRANCH, #773854,

        Petitioner,

CASE NO. 2:13-CV-13017
v.                                           HONORABLE NANCY G. EDMUNDS

WILLIE SMITH,

        Respondent.
_____/

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

### I.    Introduction

This is a habeas case brought pursuant to 28 U.S.C. § 2254. Michigan prisoner Coriell Tyquan Branch ("Petitioner") was convicted of second-degree murder, MICH. COMP. LAWS § 750.317, two counts of assault with intent to commit great bodily harm less than murder, MICH. COMP. LAWS § 750.84, carrying a concealed weapon, MICH. COMP. LAWS § 750.227, and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Genesee County Circuit Court. He was sentenced to 375 months to 50 years imprisonment, two concurrent terms of 57 months to 10 years imprisonment, a concurrent term of two to five years imprisonment, and a consecutive term of two years imprisonment on those convictions. In his petition, he raises claims concerning the admission of hearsay (a co-defendant's statement to police), the conduct of the prosecutor, and the jury instructions. For the reasons set forth herein, the Court denies with prejudice the habeas petition. The Court also denies a certificate of appealability and denies leave to proceed in forma pauperis on appeal.

II. **Facts and Procedural History**

Petitioner's convictions arise from a shooting incident in which he and another man, Reonta Deshon Hunter, fired shots at two men on the street, but missed those men and instead shot and killed a 13-year-old girl. A third man, Tarius Barksdale, drove the car carrying the two shooters. After all three men were arrested and charged with murder, Barksdale pleaded guilty to second-degree murder and felony firearm and agreed to testify against the other two men.

On direct appeal, defense counsel summarized the trial testimony as follows:

Maria Williams testified that on August 20, 2009, her daughter Donnesha Williams was 13 years old. (T.T. Vol. II p. 40-41) Ms. Williams was asked if Donnesha could go to the store with her two friends. (T.T. Vol. II p. 4) They walked to Zerka's Market. (T.T. Vol. II p. 44) Shortly after they had left one of her friends returned and told Ms. Williams that Donnesha had been shot. (T.T. Vol. II p. 46) She went to Zerka's Market and saw her daughter lying there. She was still alive. (T.T. Vol. II p. 47) She was taken to the hospital where she was removed from life support and she died. (T.T. Vol. II p. 51)

Antoinette Thomas testified that on August 20, 2009, she went to the store with her friend Donnesha Williams. (T.T. Vol. II p. 53-57) They were there long enough for Donnesha to buy some sunflower seeds and leave. (T.T. Vol. II p. 58) As Donnesha and her friends left they heard gunshots. (T.T. Vol. II p. 59) They started running but she saw Donnesha on the ground. (T.T. Vol. II p. 60)

Robert Lively testified that on August 20, 2009, he was at his house on the corner of Carpenter and College and he heard quite a few shots. (T.T Vol. II p. 67) He went out and heard that someone had been hit. (T.T. Vol. II p. 67) He had a video camera in his yard located on a pole. (T.T. Vol. II p. 71) The camera is hooked up to a VCR in his home and he would always record as long as he remembered to do so. He was recording when the shots had been fired. The police came to his house and asked to see the recording. (T.T. Vol. II p. 72) The tape was admitted into evidence. (T.T. Vol. II p. 73)

Celeste Garrow testified and was shown Mr. Lively's video. (T.T. Vol. II p. 80) She was coming from her house on Knickerbocker when she heard the shots. (T.T. Vol. II p. 82) She walked through yards to get to her mother's house on Tremont. (T.T. Vol. II p. 82-83) She was underneath a tree when a car parked next to her. She saw a person get out of the passenger side in the front of the vehicle and start shooting. The person in the backseat got out

2

and also started shooting and she hid behind the tree. (T.T. Vol. II p. 85) She had told the police that she looked down the road to see what they were shooting at and she couldn't see anybody. (T.T. Vol II p. 88)

Destry Ownes testified that on August 19,2009, he had contact with codefendant, Tarius Barksdale. (T.T. Vol. II p. 103) He purchased a car from Mr. Ownes. (T.T. Vol. II p. 104) On August 21,2009, he was at work and a co-employee described to him a vehicle that had been involved in a shooting the day before. (T.T. Vol. II p. 106) The fact that he was told that there was a bungee cord holding on the rear bumper sounded like it was his car that he had sold. Then he actually saw footage of the vehicle on television news. He recognized it as the vehicle he had sold to Mr. Barksdale. (T.T. Vol. II p. 107-108)

Matthew Lasky testified he worked as a patrol sergeant for the Mt. Morris Township police department on August 20,2009, when he was dispatched to College and Carpenter Road in reference to a shooting. (T.T. Vol. II p. 110-111) He saw several people had gathered near Zerka's Party Store with a person lying there. (T.T. Vol. II p. 114-115) He was one of the first law enforcement people on the scene. A lot of law enforcement people eventually appeared. (T.T. Vol. II p. 117) The person down was a young female who was still alive, but had a lot of trauma. (T.T. Vol. II p. 118) She was identified as Donnesha Williams. (T.T. Vol. II p. 119) She was transported by ambulance. Sergeant Lasky put up the crime scene tape. (T.T. Vol. II p. 120) He later observed a second crime scene that had bullet casings on College Street near Tremont. (T.T. Vol. II p. 122) That area was also secured with crime scene tape. (T.T. Vol. II p. 124) He received information that there was a video at a house near the scene. (T.T. Vol. I p. 133-134) He observed the video in which a blue Chevrolet traveled down College Street northward from Carpenter Road. The vehicle pulled over on the right side of the road and two occupants excited from the passenger side of the vehicle. The people discharged guns in a southbound direction. (T.T. Vol. II p. 133) He put out a broadcast of the description of the car involved. He turned over the scene to Sergeant McKenna and other detectives. (T.T. Vol. II p. 134) He then went to Hurley Hospital where Donnesha was to gather evidence. (T.T. Vol. II p. 135)

Mark Peck was employed as a City of Flint police officer on August 20, 2009. (T.T. Vol. II p. 151) He was dispatched to Carpenter Road near Zerka's where he observed a victim lying on a grass parkway. (T.T. Vol. II p. 152) He tried to locate witnesses. (T.T. Vol. II p. 155) He observed shell casings scattered on College Street and helped secure that scene. (T.T. Vol. II p. 156)

David Forystek testified that he is employed as a Sergeant for the City of Flint Police Department. (T.T. Vol. II p. 159-160) He has specialized training in forensic mapping of crime scenes. (T.T. Vol. II p. 161) On August 20,2009,

3

he responded to the crime scene at Carpenter and College. (T.T. Vol. II p. 162) His duties were to complete a map of the area showing the location of any evidence that the officer in charge wanted marked. (T.T. Vol. II p. 164) He walked the scene and then used his mapping equipment to make measurements where everything was at. (T.T. Vol. II p. 172) The map he created was admitted as an exhibit. (T.T. Vol. II p. 174-175)

Datavius Wilson testified that on August 20, 2009, he went to Beecher. (T.T. Vol. II p. 188-190) He walked down College to his friend Kim's house. (T.T. Vol. II p. 191) He met up with Kenyatta Johnson there. (T.T. Vol. II p. 192) Then he and Mr. Johnson walked to Dario's house to playa game. He lived on Donaldson in Beecher. (T.T. Vol. II p. 195) The he and Mr. Johnson walked to Uncle Alex's house on College and York. (T.T. Vol. II p. 197) Then they went to Zerka's store. After Zerka's they were passed by a green Grand Prix that had four guys who stared at them. (T.T. Vol. II p. 203) They kept walking back to Dario's home. He wasn't home. (T.T. Vol. II p. 204) Then they were going to walk to Flint to a friend's house on College and Holbrook. (T.T. Vol. II p. 205) As they were crossing Carpenter they saw a blue four door Chevy. Mr. Wilson took off running. (T.T. Vol. II p. 206) The same people were in the blue car that were in the green car. (T.T. Vol. II p. 208) After they crossed Carpenter, Mr. Johnson pushed him and he heard shots and bullets hitting the dumpster near Zerka's. He hit the ground and looked back at the blue car. (T.T. Vol. II p. 213-214) He saw two guys aiming guns and shooting towards him. The car was stopped near College and Tremont. (T.T. Vol. II p. 214) He identified DefendantAppellant and co-defendant, Reonta Hunter as being in the car. (T.T. Vol. II p. 224-227) During the shooting, Mr. Johnson saw the girl that was hit by the shots and stopped to be with her. (T.T. Vol. II p. 228-229) He had seen the girl with two other girls leave the store. (T.T. Vol. II p. 229) Mr. Wilson then went to Mr. Johnson and the girl. He called his mother to get him. (T.T. Vol. II p. 234) No police officers talked to him at the scene. (T.T. Vol. II p. 236) He heard about twenty shots fired at him. When the car went by them, neither he nor Mr. Johnson made gestures or dirty looks. (T.T. Vol. II P. 244)

Dr. Allecia Wilson testified that she is employed as the deputy Genesee County medical examiner. (T.T. Vol. III p. 42) The trial court recognized her as an expert in forensic pathology. On August 24,2009, she examined the body of Donnesha Williams. (T.T. Vol. III p. 45) She observed two wounds consistent with gunshot wounds to the head. (T.T. Vol. III p. 46) There was an entrance and exit wound. (T.T. Vol. III p. 48) Two bullet fragments were removed from the head. (T.T. Vol. III p. 52) The cause of death was the gunshot wound to the head. The manner of death was homicide. (T.T. Vol. III p. 58)

Tarius Barksdale testified that he entered a plea to second degree murder and felony firearm. His minimum sentence was to be fifteen years. (T.T. Vol. III p. 64) He agreed to give truthful testimony in this case. (T.T. Vol. III p. 65)

4

He knew Defendant-Appellant from going to school with him. (T.T. Vol. III p. 67) He identified Defendant-Appellant. (T.T. Vol. III p. 68) He also knew and was able to identify Reonta Hunter. (T.T. Vol. III p. 69) He had purchased an older Chevrolet Impala on either August 18th or August 19th (T.T. Vol. III p. 70) On August 20, 2009, his friends Ammeleo Wilson, Reonta Hunter and Defendant-Appellant were all at his house. (T.T. Vol. III p. 71) They decided to ride in his car. (T.T. Vol. III p. 72) Mr. Hunter was seated next to him in the passenger seat. Mr. Wilson sat behind Mr. Barksdale and Defendant-Appellant sat next to Mr. Wilson. (T.T. Vol. III p. 75) He drove to an apartment at Cedar Shores and smoked marijuana with his cousin. (T.T. Vol. III p. 77) From there they went to College Street. (T.T. Vol. III p. 78) There was a discussion about music tracks that were made from guys on College Street that disrespected their neighborhood. (T.T. Vol. III p. 79) They were going to see his daughter. (T.T. Vol. III p. 82) When they turned on to College Street they saw two guys walking, that Mr. Barksdale has never seen before. (T.T. Vol. III p. 84) No one in the car made any gestures to the guys. (T.T. Vol. III p. 86) The taller, light skinned guy with the braids that was walking threw his hands up. (T.T. Vol. III p. 87) Mr. Barksdale continued to drive slowly. Then co-defendant Hunter told him to stop. (T.T. Vol. III p. 89) He then saw that co-defendant Hunter and Defendant-Appellant had weapons. He had not seen them before. (T.T. Vol. III p. 90) They both left the vehicle and started shooting first. (T.T. Vol. III p. 91) Hunter had left the car and started shooting first. (T.T. Vol. III p. 91) He heard about 21 shots. They got back into the car and Mr. Barksdale drove off. He had no idea that Donnesha Williams had been struck. (T.T. Vol. III p. 93) Mr. Barksdale never had a gun. He drove to Summit Street and Mr. Hunter and Defendant-Appellant left the car. (T.T. Vol. III p. 94) When he got out of the car Mr. Hunter's gun jammed. He racket it and then he was able to shoot. (T.T. Vol. III p. 96) Ammeleo Wilson later told him Donnesha Williams had been shot. (T.T. Vol. III p. 102) He parked his car behind the house to hide it. (T.T. Vol. III p. 103) He had seen Defendant-Appellant with a nine millimeter gun. (T.T. Vol. III p. 105) He then identified the gun Defendant-Appellant had and it was admitted into evidence. (T.T. Vol. III p. 107) The gun had been found at his house. He didn't know how it got there. (T.T. Vol. III p. 108)

Ronald Crichton testified and was recognized as an expert in firearm and tool mark identification. (T.T. Vol. III p. 197-201) He received multiple .40 caliber and nine millimeter caliber casings from the Mt. Morris Township police department. (T.T. Vol. III p. 201-209) He determined the six .40 caliber fired cartridge casings were all fired from the same firearm. (T.T. Vol. III p. 211-212) He also determined that the 10 nine millimeter caliber fired cartridge cases were fired from the same firearm. They were all fired from the Kel Tec nine millimeter firearm provided by the Mt. Morris Township police. (T.T. Vol. III p. 212-213) He also received two bullet fragments from the Mt. Morris Township police department. (T.T. Vol. III p. 216-217) He concluded the fragments were consistent with having been fired from a .40 caliber and

5

not the nine millimeter. (T.T. Vol. III p. 218-220)

Kenyatta Johnson testified that he is a close friend with Datavious Wilson. (T.T. Vol. III p. 224) On August 20, 2009, he was at Dario's house. (T.T. Vol. III p.225-226) He had walked over there from Zerka's Party Store. (T.T. Vol. III p. 227) He had seen Mr. Wilson at Zerka's and they walked to Dario's house. On the way there they were passed by a green car that contained four guys that smiled at them. (T.T. Vol. III p. 228) From Dario's they decided to walk back to Zerka's. (T.T. Vol. III p. 229-230) On the way to Zerka's on College they were passed by a blue Chevrolet Caprice that contained the same four guys. (T.T. Vol. III p. 231) They were walking south on College and the vehicle went north on College. (T.T. Vol. III p. 233) The people looked at him and smiled when they passed. (T.T. Vol. III p. 236) He didn't give them a particular look or make a gesture as the vehicle passed them. (T.T. Vol. III p. 237) At Zerka's, Mr. Johnson stepped onto College Street so he could look back at the vehicle. He saw the brake lights come on and saw both the front and rear passenger doors open. (T.T. Vol. III p. 239) He saw two guys get out and lift up their arms. He pushed Mr. Wilson out of the way and heard 18-20 gunshots. He saw Donnesha and her friends. (T.T. Vol. III p. 240) The girls ran next to him. Then he saw Donnesha fall. He went over and rubbed her back. (T.T. Vol. III p. 242) He told people that ran out to call the police. (T.T. Vol. III p. 244) He held Donnesha until the police came. (T.T. Vol. III p. 245) He identified Defendant-Appellant as the front seat passenger and co-defendant, Reonta Hunter, as being in the back seat. The shooters were too far away for him to identify. (T.T. Vol. III p. 245-246) The police came after a few minutes and interviewed him. (T.T. Vol. III p. 248) He didn't tell the police he had been with Mr. Wilson because he was trying to protect him from retaliation. (T.T. Vol. III p. 249) He had no gun on August 20, 2009 and he did nothing to cause anyone to believe he had a gun. (T.T. Vol. III p. 251)

Ammeleo Wilson testified that he is a friend of Tarius Barksdale. (T.T. Vol. IV p. 4-5) He also considered Defendant-Appellant a friend. (T.T. Vol. IV p. 6) He knew Reonta Hunter from seeing him around. (T.T. Vol. IV p. 8) On August 20, 2009, he went to Tarius Barksdale's house. (T.T. Vol. IV p. 9-10) Mr. Barksdale had just bought a blue Chevrolet Impala. (T.T. Vol. IV p. 11) They decided to ride around in the blue Impala. (T.T. Vol. IV p. 12) Defendant-Appellant and Reonta Hunter also went riding with him and Mr. Barksdale. (T.T. Vol. IV p. 13) They rode around for a couple of hours. On the way home they went on Carpenter and College. (T.T. Vol. IV p. 14) There they saw two guys. One of them threw his hands up. (T.T. Vol. IV p. 15) He didn't know that here were guns in the car. (T.T. Vol. IV p. 17) They drove a couple of blocks and the car stopped. (T.T. Vol. IV p. 18) Then Defendant-Appellant and Mr. Hunter got out of the car. Mr. Wilson heard gunshots. No one said anything. (T.T. Vol IV p. 19) He didn't look out the rear window to see what they were doing. (T.T. Vol IV p.20) He heard 14 or 15 gunshots. He ducked down after the gunshots Defendant-Appellant and Mr.

6

Hunter got back into the car. (T.T. Vol. IV p. 21) Defendant-Appellant gave Mr. Wilson his gun and told him to fix it. The slide was stuck back and then gave the gun back to Defendant-Appellant. (T.T. Vol. IV p. 23) After the shooting they all drove back to Mr. Barksdale's house. (T.T. Vol. IV p.26) That evening he saw on the news that a little girl had been shot. (T.T. Vol. IV p. 27) He talked to his father about this. (T.T. Vol. IV p. 28) His father called his cousin, a Flint police officer, Mona Patterson. (T.T. Vol. IV p. 29) Officer Patterson went to their house. Defendant-Appellant also came over. (T.T. Vol. IV p.30) Then both of these co-defendants and their parents went to the police station. (T.T. Vol. IV p. 31) He told Chief McKenna what happened and later entered a guilty plea. (T.T. Vol. IV p. 32) He plead to carrying a concealed weapon and was sentenced as a juvenile to Glen Mills for 14 months. (T.T. Vol. IV p. 33)

Scott McKenna testified that he is the Chief of Police for the Mt. Morris police department. (T.T. Vol. IV p. 104) He is the officer in charge of this case. (T.T. Vol. IV p. 105) On August 20, 2009, he was on call and received a call about a shooting on College and Carpenter. He responded to the scene. (T.T. Vol. IV p. 106-107) The scene was secured and Chief McKenna tried to gather information from the Mt. Morris Township and City of Flint police officers on the scene. (T.T. Vol. IV p. 112-113) He viewed Mr. Lively's video. (T.T. Vol. IV p. 113) He asked Channel 12 to videotape from his video. (T.T. Vol. IV p. 114) They showed the vehicle on the 11:00 news and to contact him if somebody recognized the car. (T.T. Vol. IV p. 115) He had seen Kenyatta Johnson at the scene that evening. (T.T. Vol. IV p. 135) He interviewed Kenyatta Johnson at the scene. Kenyatta Johnson told him that he was with a 15 year old buddy named Tay, but would not provide much more information. (T.T. Vol. VI p. 136) Kenyatta Johnson told him that the bumper of the vehicle was held up by a bungee cord. He provided this information to Channel 12 news. (T.T. Vol. IV p. 138-139) He received a call from Destry Owens, who informed him he sold the car to Tarius at 6124 Cypress. They went to the address and saw the car parked in the backyard. (T.T. Vol. IV p. 145) When Tarius Barksdale was seen leaving the house he was arrested by the police and he had detectives "hold the house down" so he could secure a search warrant. (T.T. Vol. IV p. 146) The judge signed the warrant and the police searched the house. (T.T. Vol. IV p. 150) Above Mr. Barksdale's bed the police found the Kel Tec nine millimeter and a large amount of ammunition under his mattress. (T.T. Vol. IV p. 151) They also found a loaded .38 near his bed. (T.T. Vol. IV p. 153) He interviewed Tarius Barksdale. (T.T. Vol. IV p. 156) Over objection by defense counsel his statement was read to the jury. (T.T. Vol. IV p. 157-195) Chief McKenna heard a few days later that Donnesha was brain dead. Then he heard that her mother had authorized the hospital to "pull the plug." (T.T. Vol. V p. 13-14) He was advised that City of Flint police officer Mona Patterson had persuaded Defendant-Appellant and Ammeleo Wilson to come in and talk to him. (T.T. Vol. V p. 15) He went to the Mt. Morris Township Police Department and met with Ms. Patterson and the defendants. (T.T. Vol. V p.

7

> 16) He first met with the defendants' parents. (T.T. Vol. V p. 17-18) Because both defendants were 16, he read the Miranda rights to the parents. The parents waived the rights to allow their children to speak to him. Then he spoke to Ammeleo Wilson and Defendant-Appellant. (T.T. Vol. V p. 18-19) The tape and transcript of Defendant-Appellant's statement were admitted into evidence. (T.T. Vol. V p. 36-39) Defendant-Appellant told Chief McKenna that on College Street they saw a guy who pulled up his shirt and "he had a strap so we jumped out of the car, out the street and just got shooting at him. But I ain't seen no little girl." (T.T. Vol. V p. 42) He didn't know the guy in the front passenger seat because he was Mr. Barksdale's friend. (T.T. Vol. V p. 43-44) They thought the guy on College Street had a gun and was about to shoot at the car. (T.T. Vol. V p. 45) If he had seen the little girl he wouldn't have shot. (T.T. Vol. V p. 46) He admitted that no one had actually saw the guy with a gun. (T.T. Vol. V p. 47) As soon as he heard the first shot the guy ran. (T.T. Vol. V p. 48) He had a nine millimeter gun that wasn't his. (T.T. Vol. V p. 50) Mr. Barksdale gave him the gun telling him, "Tay not fittin to be the only one shooting." (T.T. Vol V p. 53) He emptied the gun. (T.T. Vol. V p. 54) After the shooting they took the car back to Mr. Barksdale's house. (T.T. Vol. V p. 55-56) He first gave the gun to Mr. Wilson and asked him to fix it. Then he gave it to Mr. Barksdale. (T.T. Vol. V p. 56) When he heard that a 13 year old girl was shot and killed he said, "My heart just dropped." (T.T. Vo. V p. 60)
>
> Mona Patterson testified that she is employed as a City of Flint police officer. On August 22, 2009, she received a telephone call from Ammeleo Wilson. As a result of that call she went to his house. (T.T. Vol. V p. 130) When she arrived Defendant-Appellant was also there. Then she contacted Detective Randy Yount of Mt. Morris Township because both Ammeleo Wilson and Defendant-Appellant wanted to turn themselves in. (T.T. Vol. V p. 132) Defendant-Appellant made it clear to her that he wanted to turn himself in. (T.T. Vol. V p. 133) Defendant-Appellant voluntarily got into her personal automobile knowing she was going to take him to the Mt. Morris Township Police Department. (T.T. Vol. V p. 135).

Def. App. Brf., pp. 6-19.

Following his convictions and sentencing, Petitioner filed an appeal of right with the Michigan Court of Appeals raising the same claims presented on habeas review. The court affirmed Petitioner's convictions. *People v. Branch*, No. 299859, 2012 WL 468260 (Mich. Ct. App. Feb. 14, 2012) (unpublished). Petitioner filed an application for leave to appeal with the Michigan Supreme Court raising the same issues, which was denied in a standard order. *People v. Branch*, 492 Mich. 855, 817 N.W.2d 75 (2012).

8

Petitioner thereafter filed his federal habeas petition raising the following claims:

I. He was denied his constitutional right to a fair trial by the admission of prejudicial hearsay.

II. He was denied his constitutional rights to due process and a fair trial where the prosecutor used sympathy for the victim to obtain a conviction.

III. He was denied due process where the jury was not properly instructed.

Respondent has filed an answer to the petition contending that it should be denied. Petitioner has filed a reply to that answer.

## III. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified 28 U.S.C. § 2241 *et seq.*, provides the standard of review for federal habeas cases brought by state prisoners. The AEDPA provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' ... clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*,

9

540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

The Supreme Court has held that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, _ U.S. _, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)). Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the

state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court" and quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam). Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 131 S. Ct. at 785. Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). While the requirements of "clearly established law" are determined solely by Supreme Court precedent, the decisions of lower federal courts may be useful in assessing the reasonableness of the state court's resolution of an issue. *See Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

A state court's factual determinations are presumed correct on federal habeas review. 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

11

Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, _ U.S. _, 131 S. Ct. 1388, 1398 (2011).

## IV. Analysis

### A. Evidentiary Claim

Petitioner first asserts that he is entitled to habeas relief because the trial court erred in admitting co-defendant Tarius Barksdale's pre-trial statement to police because it was hearsay and bolstered his trial testimony. In that statement, Barksdale provided information to Police Chief Scott McKenna that was largely consistent with his trial testimony. Respondent contends that this claim is non-cognizable and lacks merit.

Alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). "Trial court errors in state procedure or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action, unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (quoting *McGuire*, 502 U.S. at 69-70); *see also Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010) (citing *Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007)); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

The Michigan Court of Appeals denied relief on this claim finding that Barksdale's police statement was not hearsay and was properly admitted under Michigan Rule of Evidence 801(d)(1)(B), which allows for the admission of a witness's prior consistent statement through a third party's testimony as long as certain conditions are met. The

12

court explained in relevant part:

> We find that the trial court properly admitted Barksdale's prior statement to McKenna.[FN17] During Barksdale's cross-examination, Branch's attorney implied that Barksdale had an improper motive for his testimony. Specifically, Branch's attorney indicated that the prosecution recommended a sentence of 13 years' imprisonment for Barksdale's guilty plea to second-degree murder, as opposed to him being tried for first-degree murder, conviction for which would mean life imprisonment without the possibility of parole. Branch's counsel also suggested that because Barksdale had not yet been sentenced, his testimony could affect the sentence that he would receive. Moreover, Branch's attorney questioned Barksdale regarding what information he had access to while he was in jail. Barksdale admitted to being provided with witness statements and police reports, and counsel further implied that having access to such information provided him with the opportunity to review the prosecution's case before testifying, impacting his testimony.
>
> FN17. MRE 801(d)(1)(B).
>
> Barksdale's prior statement was substantially consistent with his in-court testimony. In addition, Barksdale voluntarily made the statement to McKenna shortly after the incident, and there is nothing in the record to suggest that a plea agreement had been offered at that time. As such, Barksdale's statement was not hearsay and was properly admitted against Branch.

*Branch*, 2012 WL 468260 at *2.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. First, to the extent that Petitioner asserts that the trial court erred in admitting the disputed testimony under the Michigan Rules of Evidence, he merely alleges a state law violation which does not entitle him to federal habeas relief. *See, e.g., Beach v. Moore*, 343 F. App'x 7, 11 (6th Cir. 2009). State courts are the final arbiters of state law and the federal courts will not intervene in such matters. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002).

Second, Petitioner fails to establish that the admission of the disputed evidence

violated his due process rights. The testimony at issue was properly admitted as a prior consistent statement under Michigan Rule of Evidence 801(d) to refute defense counsel's implication that Barksdale's testimony was the product of an improper motive. As such, the testimony was not hearsay. Petitioner fails to show that the admission of Barksdale's police statement was erroneous, let alone fundamentally unfair.

Third, the Court notes that the admission of the disputed testimony did not violate Petitioner's confrontation rights. In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the testimonial statement of a witness who does not appear at trial is inadmissible unless the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. Testimonial statements include preliminary hearing testimony, grand jury testimony, prior trial testimony, and statements made during police interrogations. *Id.* at 54. In this case, co-defendant Barksdale appeared and testified at trial. Petitioner had the opportunity to question him about his police statements. Consequently, no confrontation violation occurred.

Lastly, the Court notes that the potential risk of unfair prejudice was mitigated by the fact that the trial court instructed the jury on the proper consideration of the evidence. Jurors are presumed to follow a court's instructions. See *Penry v. Johnson*, 532 U.S. 782, 799 (2001) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)); *United States v. Powell*, 469 U.S. 57, 66 (1984) ("Jurors . . . take an oath to follow the law as charged, and they are expected to follow it."). Petitioner fails to show that the admission of Barksdale's police statement was erroneous or, more importantly for purposes of habeas review, that it rendered his trial fundamentally unfair. Habeas relief is not warranted on this claim.

### B. Prosecutorial Misconduct Claim

Petitioner next asserts that he is entitled to habeas relief because the prosecutor

relied upon sympathy for the victim to obtain a conviction. Respondent contends that this claim is barred by procedural default and otherwise lacks merit.

Federal habeas relief may be precluded on a claim that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *Wainwright v. Sykes*, 433 U.S. 72, 85-87 (1977); *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir. 1991). The doctrine of procedural default applies when a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2006); *Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005); *Coleman v. Mitchell*, 244 F.3d 533, 539 (6th Cir. 2001). "A procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263-64 (1989). The last explained state court ruling is used to make this determination. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991).

The Michigan Court of Appeals rendered the last reasoned opinion on this claim. In denying relief, the court relied upon the failure to object at trial. *Branch*, 2012 WL 468260 at *2. The failure to make a contemporaneous objection is a recognized and firmly-established independent and adequate state law ground for refusing to review trial errors. *People v. Carines*, 460 Mich. 750, 763, 597 N.W.2d 130, 138 (1999); *People v. Stanaway,* 446 Mich. 643, 687, 521 N.W.2d 557, 579 (1994); *see also Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991). Moreover, a state court does not waive a procedural default by looking beyond the default to determine if there are circumstances warranting review on the merits. *Paprocki v. Foltz*, 869 F.2d 281, 285 (6th Cir. 1989). Plain error review does not constitute a waiver of state procedural default rules. *Girts v.*

15

*Yanai*, 501 F.3d 743, 755 (6th Cir. 2007); *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). Nor does a state court fail to sufficiently rely upon a procedural default by ruling on the merits in the alternative. *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991). The Michigan Court of Appeals denied relief on this claim based upon a procedural default – the failure to object at trial.

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 753; *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996). To establish cause, a petitioner must establish that some external impediment frustrated his or her ability to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A petitioner must present a substantial reason to excuse the default. *Amadeo v. Zant*, 486 U.S. 214, 223 (1988). Such reasons include interference by officials, attorney error rising to the level of ineffective assistance of counsel, or a showing that the factual or legal basis for a claim was not reasonably available. *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991).

In this case, Petitioner neither alleges nor establishes cause to excuse this procedural default. The Court need not address the issue of prejudice when a petitioner fails to establish cause to excuse a procedural default. *Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir.1983). Nonetheless, the Court notes that even if Petitioner could establish cause, he cannot establish actual prejudice as the claim lacks merit. As explained by the Michigan Court of Appeals on plain error review, the prosecutor's references to sympathy for the victim were not improper when considered in context – and the trial court instructed the jury about the proper

16

consideration of the evidence and informed them that the attorneys' comments are not evidence. Petitioner fails to show that the prosecutor's conduct was improper, let alone that it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnelly*); *Parker v. Matthews*, _ U.S. _, 132 S. Ct. 2148, 2153 (2012) (confirming that *Donnelly/Darden* is the proper standard).

Petitioner also fails to demonstrate that a fundamental miscarriage of justice occurred. The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 479-80 (1986). To be credible, such a claim requires a petitioner to provide new, reliable evidence that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Moreover, actual innocence means factual innocence, not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998). Petitioner makes no such showing. This claim is thus barred by procedural default, lacks merit, and does not warrant habeas relief.

### C. Jury Instruction Claim

Lastly, Petitioner asserts that he is entitled to habeas relief because the trial court erred in instructing the jury about the proper consideration of Tarius Barksdale's juvenile adjudications. While the jury heard about the juvenile case, the trial court refused to instruct the jury that it could be used in evaluating his credibility. Respondent contends that this claim is non-cognizable and lacks merit.

In order for habeas relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned. Rather, taken as a whole, they must be so infirm that they

17

rendered the entire trial fundamentally unfair. *Estelle*, 502 U.S. at 72; *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). If an instruction is ambiguous and not necessarily erroneous, it violates the Constitution only if there is a reasonable likelihood that the jury applied the instruction improperly. *Binder v. Stegall*, 198 F.3d 177, 179 (6th Cir. 1999). A jury instruction is not to be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Grant v. Rivers*, 920 F. Supp. 769, 784 (E.D. Mich. 1996). Also, the failure to give an instruction that is supported by the evidence does not automatically justify habeas relief – the failure to instruct must have rendered the trial fundamentally unfair. *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Daniels v. Lafler*, 501 F.3d 735, 741 (6th Cir. 2007). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson*, 431 U.S. at 155. State law instructional errors rarely form the basis for federal habeas relief. *Estelle*, 502 U.S. at 71-72.

In this case, the Michigan Court of Appeals acknowledged that the trial court incorrectly ruled that evidence of juvenile adjudications is not admissible for any purpose because they are permitted for impeachment purposes under certain circumstances under state law. The court nonetheless denied relief on this claim because any error in instructing the jury was not outcome determinative and defense counsel was able to challenge Barksdale's credibility by other means. *Branch*, 2012 WL 468260 at *3.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. Any error by the trial court in instructing the jury on this issue did not render the trial fundamentally unfair because the instructions as a whole were sufficient to inform the jury of the elements of the crime and the proper consideration of the evidence, as well as Petitioner's defense and other matters

18

to relevant to his interests. Moreover, defense counsel had other opportunities to dispute Barksdale's version of events and impeach his credibility such that the jury was well aware of his potential bias against Petitioner. No due process violation occurred.

Furthermore, to the extent that any error could be seen as a constitutional one, it was nonetheless harmless. For purposes of federal habeas review, a constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993): *see also Fry v. Pliler*, 551 U.S. 112, 117–18 (2007) (confirming that the *Brecht* standard applies in "virtually all" habeas cases); *Ruelas v. Wolfenbarger*, 580 F.3d 403, 411 (6th Cir. 2009) (ruling that *Brecht* is "always the test" in the Sixth Circuit). Such was the case here. Any error in instructing the jury did not influence the jury's verdict. Habeas relief is not warranted on this claim.

## V. Conclusion

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on the claims contained in his petition. Accordingly, the Court **DENIES** and **DISMISSES WITH PREJUDICE** the petition for a writ of habeas corpus.

Before Petitioner may appeal the Court's decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); FED. R. APP. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that ... jurists could conclude the issues presented are adequate to deserve encouragement

19

to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Having conducted the requisite review, the Court concludes that Petitioner fails to make a substantial showing of the denial of a constitutional right as to his habeas claims. Accordingly, the Court **DENIES** a certificate of appealability. The Court also **DENIES** leave to proceed in forma pauperis on appeal because an appeal cannot be taken in good faith. *See* FED. R. APP. P. 24(a). This case is closed.

**IT IS SO ORDERED.**

/s/ Nancy G. Edmunds
NANCY G. EDMUNDS
UNITED STATES DISTRICT JUDGE

Dated: July 2, 2015